**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CHERYLENE CARLTON,
o/b/o F.S.M.

              Plaintiff,

vs.                                   Case No. 8:08-cv-62-T-JRK

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.

_____/

**OPINION AND ORDER**[1]

**I. Status**

      Cherylene Carlton, on behalf of her minor grandchild, F.S.M.,[2] is appealing the

Commissioner of the Social Security Administration's final decision denying a claim for

benefits under the Social Security Act. An application for supplemental security income was

filed on behalf of Claimant on November 6, 2003, alleging disability beginning October 27,

2003. Transcript of Administrative Proceedings ("Tr.") at 60-61.[3] After holding a hearing on

April 27, 2007, the Administrative Law Judge ("ALJ") issued a decision finding Claimant was

not disabled through the date of the decision, June 29, 2007. Tr. at 11-27. The Appeals

---

    [1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge, <u>see</u>
Consent to the Exercise of Jurisdiction by a United States Magistrate Judge (Doc. No. 12), and the Order
of Reference was entered on March 24, 2008 (Doc. No. 14).

    [2] For purposes of this Opinion and Order, the designation "Claimant" refers to the minor child,
F.H.M.

    [3] Claimant's mother, Tia Cook, filed the application.

Council denied review on November 30, 2007. Tr. at 4-7. On January 11, 2008, this action was commenced under 42 U.S.C. § 405(g) by the timely filing of the Complaint (Doc. No. 1) seeking review of the Commissioner's final decision. The available administrative remedies have been exhausted, and the case is properly before the Court. Three issues are raised on appeal: (1) whether the ALJ improperly discredited the testimony of Ms. Carlton, Claimant's grandmother; (2) whether the ALJ's findings were supported by substantial evidence; and (3) whether the Appeals Council incorrectly refused to hear new evidence. See Memorandum of Law (Doc. No. 16; "Pl.'s Mem."). For the reasons explained herein, the undersigned concludes the ALJ had sufficient reasons for discrediting Ms. Carlton's testimony, the ALJ's findings were supported by substantial evidence, and the new evidence submitted to the Appeals Council did not render the denial of benefits erroneous. Therefore, the Commissioner's final decision is due to be **AFFIRMED**.

## II. Background

Claimant was born in 1996. Tr. at 60. He was ten years old and in third grade on the date of the hearing. Tr. at 301, 313. There is some indication Claimant's mother used illegal drugs during pregnancy, Tr. at 225, although she has denied doing so. Tr. at 169. At some point, Claimant's grandmother, Ms. Carlton, became Claimant's guardian. See Pl.'s Mem. at 1. At the time of the hearing, Claimant lived with his grandmother and seven other children. Tr. at 307. The claim of disability is based on alleged Attention Deficit Hyperactivity Disorder, Adjustment Disorder with Disturbance of Conduct, Oppositional Defiant Disorder, and a learning disability. Tr. at 58, 91.

## A. Academic History

Claimant attended Kindergarten at Bowling Green Elementary School during the 2002-2003 school year. Tr. at 140. On his Kindergarten Report, Claimant received marks of "N" (needs improvement) in many areas at the beginning of the year. Tr. at 84. However, in the fourth grading period, which appears to be the last, Claimant earned marks of "S" (satisfactory) in almost all of the areas listed on the Kindergarten Report. Id. In Language Arts, Claimant knew all of the letters of the alphabet and their sounds, and he had successfully acquired all of the skills listed on the Kindergarten Report, including the ability to "speak clearly and express thoughts in complete sentences," "follow 3-step directions," and "illustrate a beginning, middle, and end of a story." Id. Claimant had also successfully acquired almost all of the skills listed in the Mathematics section of the Kindergarten Report. Id. However, Claimant earned an "S-" or "N" in all areas of the Personal and Social Development section, including "follows classroom rules," "demonstrates physical control," "follows directions," "works independently," and "completes work on time." Tr. at 85. Claimant's teacher, R. Heither, stated in the Kindergarten Report, "[Claimant] has shown improvement but needs to put more effort into his work." Id. A review of the Kindergarten Record reveals that neither Claimant's teacher nor Claimant's mother requested a conference at the end of any of the reporting periods. Id.

During the 2003-2004 school year, Claimant was in first grade. Tr. at 164. On the School Record, Claimant earned a yearly average of four marks of "F" and two marks of "N."

Id.[4]  Claimant was retained in first grade and transferred to Wauchula Elementary School. Tr. at 141.  On January 12, 2004, Claimant's teacher, Patty Jo Schrader, completed a Teacher Questionnaire form for the Social Security Administration. Tr. at 106-13.  On the Teacher Questionnaire, Ms. Schrader stated there had been an unusual degree of absenteeism at the beginning of the school year, but it had improved.  Tr. at 106.  Ms. Schrader evaluated Claimant in six domains of functioning on the Teacher Questionnaire. Tr. at 106-13.  In the domain of acquiring and using information, Ms. Schrader indicated Claimant had a "slight problem" in six areas, including comprehending oral instructions, understanding school and content vocabulary, and understanding and participating in class discussions. Id.  Ms. Schrader indicated Claimant had an "obvious problem" in two areas: learning new material and applying problem-solving skills in class discussions. Id.  Ms. Schrader indicated Claimant had a "serious problem" reading and comprehending written material, and a "very serious problem" expressing ideas in written form.  Id.

In the domain of attending and completing tasks, Ms. Schrader indicated Claimant had "no problem" in four areas, including paying attention when spoken to directly and sustaining attention during play/sports activities. Tr. at 108. Ms. Schrader believed Claimant had a "slight problem" changing from one activity to another without being disruptive, an "obvious problem" carrying out multi-step instructions and working without distracting himself or others, and a "very serious problem" working at a reasonable pace/finishing on time. Id. Ms. Schrader indicated Claimant had a "serious problem" in five areas, including focusing long enough to finish assigned activity or task, refocusing to task when necessary,

---

[4]  The photocopy of the School Record omitted a small portion of the page, so it is not possible to determine the subjects in which Claimant's grades were earned.  Tr. at 164.

completing class/homework assignments, and completing work accurately without careless mistakes. Id. Ms. Schrader noted Claimant had these problems on a daily basis. Id. Ms. Schrader indicated Claimant had no problems in the domains of interacting and relating with others, moving about and manipulating objects, caring for himself, and medical conditions and medications/health and physical well-being. Tr. at 109-12.

Claimant repeated First grade in 2004-2005. Tr. at 141, 164. On the School Record, he earned a yearly average of four marks of "D" and two marks of "S-." Tr. at 164.

Due to Claimant's low academic performance, as well as emotional and behavioral concerns, the Wachula Elementary Child Study Team referred Claimant to Mary B. Beldin, Ed.S., a School Psychologist, for a psychological evaluation. Tr. at 140. A Psychological Report was completed by Ms. Beldin on June 29, 2005. Tr. at 140-47. In the Psychological Report, Ms. Beldin summarized Claimant's background, made observations, and interpreted the results from four tests: the Weschler Intelligence Scale for Children - Fourth Edition ("WISC-IV"); the Woodcock Johnson Psychoeducational Battery - Third Edition: Tests of Achievement; the Bender Visual Motor Gestalt Test; and the Behavior Assessment System for Children ("BASC"). Tr. at 140-47.

Summarizing Claimant's background, Ms. Beldin stated, "On the Stanford Achievement Test, [Claimant] earned a reading score in the 24th percentile and a math score in the 17th percentile." Tr. at 141. Ms. Beldin remarked, "[Claimant] received reading remediation, a reduced spelling list and lower-level reading instruction," but he "continued to make limited academic progress." Id. Ms. Beldin observed, "[Claimant] has been diagnosed with ADHD and takes adderol [sic]." Id. Ms. Beldin reported Claimant often cried

in class and tended to withdraw from others, and she noted his "emotionality and poor frustration tolerance." Id.

With respect to the results of the tests that were administered, Ms. Beldin stated as follows:

> [Claimant] obtained a Full Scale [IQ] score in the Borderline range at the 6th percentile. Chances are nine out of ten that his 'true' score would fall within the range of 74 to 82. However, given the behaviors described above this score may be an underestimate of his true abilities.

Tr. at 141.

Ms. Beldin concluded that the test results "revealed Borderline intellectual skills" and indicated Claimant's reading and writing skills were "significantly delayed." Tr. at 145. However, "[n]o processing weaknesses were noted." Id. Ms. Beldin further explained the results of her evaluation as follows:

> [Claimant] appears moderately depressed. He has significant peer relation difficulties. [Claimant] has difficulty controlling his anger and this at times becomes extreme enough to threaten others. He also reports and others report that he seems out of touch with reality. [Claimant] displays hyperactive and inattentive behaviors.

Tr. at 145.

Ms. Beldin recommended Claimant for the Emotionally Handicapped Program, and Claimant's grandmother was encouraged to seek outside support for him. Id. Ms. Beldin advised, "[E]xpect [Claimant] to learn new material at a pace that is slower than that of his peers. It will be essential to set realistic expectations and provide appropriate modifications." Tr. at 147. Ms. Beldin also made suggestions to facilitate Claimant's learning, such as presenting material at Claimant's instructional level, pacing instruction to match Claimant's learning rate, and repeating instructions on a "one-on-one basis." Tr. at 146-47.

On August 18, 2005, Wachula Elementary School developed an Individualized Educational Plan (IEP) for Claimant. Tr. at 148. Claimant was listed as "Emotionally Handicapped" on the IEP. Id. Based on Ms. Beldin's Psychological Report, the IEP noted that Claimant's "reading and writing skills are significantly delayed." Id. The "Priority Educational Need" was for Claimant to improve his coping skills and self-esteem. Tr. at 149. The "Measurable Annual Goal" was for Claimant to "maintain personal self-control throughout the school day" and to "demonstrate a positive attitude towards himself during 75% of the school day in 3 out of 4 trials." Id. Claimant was to attend counseling twice per month. Tr. at 150. He was to participate in regular curriculum eighty percent of the time. Tr. at 151.

On the School Report for 2005-2006, second grade, Claimant earned a yearly average of the following marks: two of "S," three of "C," one of "D," and one of "F." Tr. at 164. On May 18, 2006, another IEP was developed by Wachula Elementary School. Tr. at 158. The "Priority Educational Need" was for Claimant to improve his coping skills and self-esteem. Id. The "Measurable Annual Goal" was for Claimant to "control his emotions throughout the school day in all academic and non-academic activities during 70% of the school day." Tr. at 159. There is no indication that counseling was continued. Claimant was to participate in regular curriculum eighty-four percent of the time. Tr. at 161. In 2006-2007, third grade, on the School Report Claimant earned a yearly average of the following marks: two of "N," one of "B," one of "C," two of "D," and two of "F." Tr. at 164.

After the ALJ rendered his decision, additional evidence from Claimant's school was submitted to the Social Security Administration, which consisted of a Vanderbilt ADHD

Diagnostic Teacher Rating Scale completed by Claimant's third grade teacher, Ms. Bass, and a September 7, 2007 IEP from Anna Woodbury Elementary. Tr. at 7, 271-95. The Vanderbilt ADHD Diagnostic Teacher Rating Scale was not dated, but apparently it was submitted "at the end of the school year before the September 2009 educational plan." Pl.'s Mem. at 17. The Vanderbilt ADHD Diagnostic Teacher Rating Scale listed thirty-five types of behaviors, of which Ms. Bass indicated Claimant exhibited fifteen "often," including "loses things necessary for tasks or activities," "runs about or climbs excessively in situations in which remaining seated is expected," "is 'on the go' or often acts as if 'driven by a motor,'" "talks excessively," and "blurts out answers before questions have been completed." Tr. at 271-72. Ms. Bass indicated Claimant "very often" exhibited eleven of these behaviors, such as "does not seem to listen when spoken to directly," "is easily distracted by extraneous stimuli," "is forgetful in daily activities," and "fidgets with hands or feet or squirms in seat." Id.

The IEP from Anna Woodbury Elementary that was submitted to the Appeals Council applied to fourth grade. Tr. at 279.[5] It was noted that Claimant "tries hard and aims to please." Tr. at 286. According to the IEP, Claimant would need "remediation in reading and writing to pass statewide assessments." Id. The IEP indicated Claimant was "slow to complete assignments," and his previous IEP goals had not been met. Id. It appears from

_____

[5] Claimant's grandmother testified Claimant was going to be retained in third grade. Tr. at 304. However, the IEP from September 7, 2007 seems to indicate Claimant was promoted to fourth grade. Tr. at 279 (stating the IEP applies for fourth grade); 282 (stating claimant's "measurable annual goal" was to "demonstrate reading comprehension skills at the 4th grade level with 70% mastery as measured by curriculum standards, work samples, and test scores, 3 out of 4 times") (emphasis added).

the IEP that Claimant would remain in a regular classroom and attend ESE class part of the day.  Tr. at 283, 288.

### B.  Medical History

#### 1.  Peace River Center

On October 27, 2003, while Claimant was in first grade the first time, Claimant's mother took him to the Peace River Center, a community mental health organization.  Tr. at 267.  Claimant's mother reported Claimant's academic performance was poor.  Id.  The Peace River Center generated a document dated November 11, 2003 entitled Comprehensive Biophysical Assessment, according to which Claimant's overall health was "excellent," although he had "initial insomnia," was walking and talking in his sleep, and slept with his mother.  Tr. at 256.  According to the Comprehensive Biophysical Assessment, Claimant had reached development milestones, such as walking and talking, normally.  Tr. at 253.  It was noted on the Comprehensive Biophysical Assessment that Claimant was fighting with others, that Claimant told his mother that others were picking on him, that Claimant was "mean to the other children," that Claimant would not listen or follow directions at home or school, that Claimant had tried to hit a cat or chicken, and that Claimant cried very easily.  Tr. at 250, 255.  In addition, Claimant did not like school, was making poor academic progress, was not listening, would "wander off" and daydream, did not complete work, and was disruptive.  Tr. at 257.  Claimant's mother complained Claimant was careless, did not listen, could not pay attention, did not finish things, often lost things, was easily distracted, could not stay in his seat, could not play quietly, did not wait his turn in games or

conversations, acted without thinking, had poor school performance, lied "when caught red-handed," had poor concentration, and appeared to be fearful and afraid. Tr. at 249.

On November 11, 2003, in a document entitled Integrated Assessment , Rose I. Ogle, LCSW, a Clinician, made the following observations with respect to Claimant's mental status:

> [Claimant] played with the toy trucks throughout the intake appointment. He was able to stay focused during play. [Claimant] was oriented to time and person, which was appropriate for his age. Level of cognitive skills appeared to be within normal range. Level of insight and judgment skills appeared to be fair. [Claimant] appeared to be in a good mood. The mother reports problems with initial insomnia and early morning awakening; appetite is described as normal. [Claimant's] mother denied [Claimant] ever complaining of auditory or visual hallucinations. [Claimant] has never threatened suicide or homicide according to his mother.

Tr. at 251. Ms. Ogle gave Claimant a GAF score of fifty-four. Id. Ms. Ogle's diagnostic impression was that Claimant had Attention Deficit Hyperactivity Disorder ("ADHD") and Adjustment Disorder with Disturbance of Conduct. Id. On November 11, 2003, the estimated length of treatment was six months, and the prognosis was good. Tr. at 252.

A Psychiatric Evaluation was conducted on December 4, 2003. Tr. at 246. At that time, it appears Alice King, DO, diagnosed Claimant with ADHD and Oppositional Defiant Disorder. Tr. at 201, 247. Claimant may have been given a GAF score of forty-five. Tr. at 247.[6] Eleanore Murdock Davis, ARNP, reported that Dr. King started Claimant on Adderall around that time. Tr. at 201. On April 7, 2005, it appears Dr. King may have given Claimant

---

[6] In "Axis V" of the "Diagnosis/Formulation" section, Dr. King wrote: "C.G.; 45-." Tr. at 247. Claimant reads this to be a GAF score of forty-five. Pl.'s Mem. at 2.

a GAF score of thirty-five to forty. Tr. at 242.[7] On May 5, 2005, Dr. King gave Claimant a GAF score of fifty. Tr. at 240.

On August 10, 2005, Nurse Davis saw Claimant for a follow-up appointment. Tr. at 239. Nurse Davis noted Claimant was taking Adderall, and there was improvement, although Claimant was still hyperactive. Id. Nurse Davis also noted Claimant "Qualified SLD. Will be placed shortly." Id.

On September 7, 2005, Nurse Davis reported there was no improvement or change in Claimant's condition despite Claimant's use of Adderall. Tr. at 238. Nurse Davis wrote in the diagnosis section, "ADHD[;] combined EMH; Reading Disorder." Id. Claimant's dosage of Adderall was increased from ten to fifteen milligrams. Id.

On October 12, 2005, Claimant's grandmother complained to Nurse Davis that Claimant was crying frequently, pulling hair, and seemed depressed to his teacher, although he did not seem depressed at home. Tr. at 237. Nurse Davis saw no evidence of hair loss. Id. Nurse Davis wrote in the diagnosis section, "ADHD[;] Stimulus-induced OCD." Id. The dosage of Adderall was reduced to ten milligrams. Id.

On December 29, 2005, at a follow-up appointment, Nurse Davis noted Claimant was in ESE class part time. Tr. at 236. Nurse Davis wrote in the diagnosis section, "ADHD, Combined." The dosage of Adderall was increased to fifteen milligrams. Id. Nurse Davis gave Claimant a GAF score of forty-eight. Id.

---

[7] In "Axis V" of the "Diagnosis/Formulation" section, Dr. King wrote: "C.G.; 35-40." Tr. at 242. Claimant reads this to be a GAF score of thirty-five to forty. Pl.'s Mem. at 3.

At the February 8, 2006 follow-up appointment, Nurse Davis wrote in the diagnosis section, "ADHD, Combined."  The Adderall was continued.  Tr. at 235.  Nurse Davis gave Claimant a GAF score of fifty-five.  Id.

On April 27, 2006, Nurse Davis noted Claimant was struggling in school and had "tantrums when he doesn't get his way."  Tr. at 220.  Nurse Davis wrote in the Diagnosis/Formulation section, "ADHD, Combined[;] Learning Disorder."  Tr. at 221.  Nurse Davis gave Claimant a GAF score of fifty-two; his highest GAF score in the past year had been sixty.  Tr. at 222.

On December 15, 2006, Nurse Davis noted there was no further disruptive behavior.  Tr. at 216.  However, Claimant was still having academic problems and trouble completing his schoolwork.  Id.  Claimant was taking Adderall and was seeing a therapist regularly.  Id.  Nurse Davis's diagnosis was ADHD, and Claimant was directed to return for a follow-up appointment in three months.  Id.

On March 14, 2006, Nurse Davis completed a Medical Questionnaire for the Social Security Administration.  Tr. at 195.  She indicated she had treated Claimant since April of 2005, and the diagnosis was "attention deficit hyperactive disorder" and "oppositional defiant disorder."  Id.  Claimant was taking 10 milligrams of Adderall daily.  Id.  Claimant's symptoms were hyperactivity, inattention, impulsivity, and defiance of authority.  Id.  According to Nurse Davis, Claimant's functional limitations were "[d]ecreased alertness and ability to sustain attention for extended periods, which impedes learning and academic progress and performance."  Tr. at 196.  Nurse Davis stated Claimant's symptoms could be stabilized with medication, but "learning problems may persist if Learning Disorder is present."  Id.  Nurse

Davis indicated Claimant's impairment caused moderate limitations of his cognitive development, no limitations of his communicative development, no limitation of his motor development, marked limitations of his social development, moderate limitations of his personal/behavioral development, and marked limitations of his concentration, persistence, and pace. Tr. at 198-200. Nurse Davis believed Claimant's condition was chronic. Tr. at 200. Nurse Davis noted Claimant had been evaluated initially by Alice King, DO, and was prescribed Adderall. Tr. at 201. Although Claimant's symptoms stabilized with Adderall, he continued to struggle academically due to "learning disorder which co-occurs with his ADHD/ODD." Id. Nurse Davis noted Claimant was receiving ESE services part time. Id.

### 2. Dr. McLaughlin's Evaluation

The Office of Disability Determinations referred Claimant to Stacey J. McLaughlin, Ph.D., a licensed psychologist, for a Learning Disabilities Evaluation. Tr. at 173. Dr. McLaughlin conducted the psychological evaluation of Claimant on February 11, 2004. Tr. at 168-74. According to Dr. McLaughlin, Claimant was in good physical health and was not taking any medication. Tr. at 169. Dr. McLaughlin made the following additional observations:

> [Claimant] was alert and cooperative. He expressed himself spontaneously throughout the evaluation and responded to questions relevantly and appropriately.
>
> [Claimant]'s affect and mood were neutral. While he was somewhat active while playing with his little brother, he calmed down immediately when entering the examiner's office. There were no signs of ADHD or a conduct disorder noted during this examination.
>
> [Claimant] exhibited good effort and concentration throughout. Once his family left the examiner's testing room and went to wait in the waiting room, [Claimant]'s behavior became very appropriate. He was an extremely well-

-13-

behaved, polite child. There was some anxiety noted during this examination, and [Claimant] persevered and erased on several items presented. These results are believed to be a valid reflection of his current functioning level.

Tr. at 170.

Dr. McLaughlin administered the Weschler Intelligence Scale for Children-Third Edition. Tr. at 171. Claimant scored in the Borderline Range of General Intellectual Ability at the fifth percentile, with a Verbal Scale IQ score of seventy-six, a Performance Scale IQ score of seventy-nine, and a Full Scale IQ score of seventy-six. Id. Claimant's Verbal Comprehension Index was in the Borderline Range, and his Perceptual Organization Index was in the mild range of mental retardation. Id. Dr. McLaughlin also administered the Woodcock-Johnson-Third Edition and found as follows:

When compared with his intellectual functioning, [Claimant] appears to be functioning at or above expected levels in the areas of Broad Reading, Broad Mathematics, and Broad Written Language. However, when compared with his chronological age and present grade placement, [Claimant] appears to be functioning below expected levels in the areas of Broad Reading, Broad Mathematics, and Broad Written Language.

Tr. at 173.

Dr. McLaughlin's clinical impression was "Adjustment Disorder, With Mixed Disturbance of Emotions and Conduct." Id. Dr. McLaughlin recommended that Claimant continue to receive ongoing medical care and outpatient psychotherapy service from the Peace River Center to help him deal with his anxiety and behavioral difficulties. Tr. at 173, 174. Dr. McLaughlin saw no evidence of attentional problems or ADHD during the examination. Tr. at 174. Dr. McLaughlin stated, "[Claimant]'s difficulties are caused by a combination of behavioral difficulties and anxiety." Id. Dr. McLaughlin concluded, "[Claimant] does not appear to meet the criteria for a Specific Learning Disability." Id.

However, according to Dr. McLaughlin, he did appear "somewhat below age and grade levels, and he may benefit from having a tutor work with him both at home and at school." Id.

### 3. Dr. Kremper's Evaluation

William G. Kremper, Ph.D., a clinical and forensic psychologist, conducted a psychological evaluation of Claimant on January 11, 2005. Tr. at 184-87. Dr. Kremper made the following observations:

> [Claimant] was an alert, smiling lad with whom rapport was easily established. He was somewhat quiet. He displayed an appropriate degree of motor behavior for a child his age. He did not seem hyperactive. He was able to remain seated throughout the examination and did not appear to be particularly distractable in terms of looking about the room, and not paying attention to the examiner. There was no excessive gross or fine motor activity. He was seated next to the examiner's desk and did not attempt to manipulate objects on the desk. He remained appropriately seated rather than squirm in his seat. [Claimant] described himself as mostly happy. He felt like crying when people, such as an 11-year old neighbor youth, picked on him. . . .

> [Claimant]'s attention and concentration both seemed limited though he had no difficulty following engaging conversation. . . . Memory functioning for recent and remote personally relevant events seemed limited as did his verbal learning. . . . [Claimant] was able to successfully execute in order three consecutive commands. . . .

Tr. at 185.

Although Dr. Kremper acknowledged Claimant "might well display symptoms suggestive of an attention deficit hyperactivity disorder" at times, "he did not appear hyperactive and there was no excessive gross or fine motor activity." Tr. at 187. There were "[n]o significant difficulties sustaining his attention" that were readily apparent to Dr. Kremper. Id. Dr. Kremper's cognitive testing "suggested intellectual functioning within the borderline range." Id. Dr. Kremper's diagnostic impression was "Adjustment disorder with mixed

disturbance of emotions and conduct," "Borderline intellectual functioning," and "Attention deficit hyperactivity disorder, by history." Id. "[Claimant] was likely to have continuing problems at home and school settings in large part due to his low level intellectual abilities which compromised his ability to resolve social problem situations in an effective manner." Id. Dr. Kremper also believed Claimant's limited intellectual abilities were responsible for his poor performance at school. Id. Dr. Kremper opined Claimant likely found academic learning at a pace designed for the rest of the class to be overwhelming, and his response was to disengage and become inattentive. Id. Dr. Kremper recommended that Claimant seek mental health counseling to address his behavioral and emotional adjustment difficulties. Id.

### 4. Ms. Neuhofer's Evaluation, Dr. Carter's Findings, Ms. Gaudino's Findings, and Dr. Martin's Findings

On May 4, 2004, Claimant was seen by Gina L. Neuhofer, M.A., a clinician at GLN Speech Pathology Services. Tr. at 175. According to Ms. Neuhofer, "[Claimant] was highly intelligible in conversation." Id. Ms. Neuhofer concluded Claimant "presents normal articulation skills and language scores 2-3 standard deviations below his age appropriate range. Comparison to his recent psychological testing finds his language skills are commensurate with his cognitive levels. . . . Prognosis for gain is guarded." Tr. at 176.

On June 2, 2004, Deborah L. Carter, Ph.D., a licensed psychologist, reviewed Claimant's file. Tr. at 178-82. Dr. Carter found that Claimant's limitations in the domain of acquiring and using information were less than marked, that Claimant's limitations in the domain of attending and completing tasks were less than marked, and that Claimant had no limitations in any of the other domains. Tr. at 179-80.

-16-

On June 2, 2004, Rhonda Gaudino, M.S., CCC-SLP, a speech and language consultant, reviewed Claimant's file. Tr. at 183. Ms. Gaudino concluded, "[Claimant]'s language skills pose a less than marked degree of limitation on acquiring and using information. . . ." Id.

On February 2, 2005, Eric D. Martin, Ph.D., a clinical psychologist, reviewed Claimant's file. Tr. at 188-93. Dr. Martin found that Claimant's limitations in the domain of acquiring and using information were less than marked, that Claimant's limitations in the domain of attending and completing tasks were less than marked, that Claimant's limitations in the domain of interacting and relating with others were less than marked, and that Claimant had no limitations in any of the other domains. Tr. at 190-91.

## C. The ALJ's Decision

The ALJ considered all evidence of Claimant's symptoms, including opinion evidence and the testimony of Claimant's grandmother. Tr. at 11-27. The ALJ followed the required three-step sequential evaluation process for children set forth in 20 C.F.R. § 416.924(a). See Shinn ex rel. Shinn v. Comm'r of Soc. Sec., 391 F.3d 1276, 1278-79 (11th Cir. 2004) (explaining the three-step sequential evaluation process for children). At step one, the ALJ established Claimant had not engaged in substantial gainful activity at any time relevant to the decision. Tr. at 14. At step two, the ALJ found Claimant suffered from adjustment disorder and low IQ, which were severe impairments. Id. At step three, the ALJ stated Claimant's combination of impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. The ALJ also determined Claimant did not have an impairment or combination of impairments that

-17-

functionally equaled the listings. Tr. at 15-26. The ALJ concluded Claimant was not disabled.[8] Tr. at 26.

### III. Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). While no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). It is not for this Court to reweigh the evidence; rather, this Court reviews the entire record to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the

---

[8]  "An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

Commissioner's findings.  Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1158-59 (11th Cir. 2004).

## IV.  Discussion

Claimant challenges the ALJ's decision on three grounds.  First, Claimant contends the ALJ's credibility determination with respect to Ms. Carlton, Claimant's grandmother, was flawed.  See Pl.'s Mem. at 11-14.  Second, Claimant asserts the ALJ's finding that Claimant's impairments do not result in marked limitations in two domains or extreme limitation in one domain is unsupported by substantial evidence.  See id. at 14-17.  Third, Claimant argues the Appeals Council incorrectly rejected new evidence.  See id. at 17-19.  These issues are addressed in turn.

### A.  Ms. Carlton's Testimony

At the hearing before the ALJ, Ms. Carlton's testimony was offered to support Claimant's claim of disability.  Ms. Carlton testified Claimant cried often, did not pay attention, was not on task, had short-term memory loss, became angry with other children, had difficulty with his schoolwork, talked in his sleep, was unable to do simple chores, and had ADHD.  Tr. at 308-13.  Claimant argues the ALJ's decision to discredit Ms. Carlton's testimony was flawed under the standard that applies when a claimant attempts to establish disability through testimony regarding pain or other subjective symptoms.  See Pl.'s Mem. at 11-12; Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)).

To establish a disability based on testimony of pain or other subjective symptoms, a claimant must satisfy two parts of a three-part showing: (1) evidence of an underlying

medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged subjective symptoms; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed subjective symptoms. Wilson, 284 F.3d at 1225 (citing Holt, 921 F.2d at 1223 (stating that "the standard also applies to complaints of subjective symptoms other than pain")). "The claimant's subjective testimony supported by medical evidence that satisfies the standard is itself sufficient to support a finding of disability." Holt, 921 F.2d at 1223.

"[C]redibility determinations are the province of the ALJ." Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005). If, after considering such subjective testimony, the ALJ decides to discredit the testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." Wilson, 284 F.3d at 1225; see also Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005); Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (stating that "after considering a claimant's complaints of pain [or other subjective symptoms], the ALJ may reject them as not creditable, and that determination will be reviewed for substantial evidence"). "When evaluating a claimant's subjective symptoms, the ALJ must consider such things as: (1) the claimant's daily activities; (2) the nature, location, onset, duration, frequency, radiation, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) adverse side-effects of medications, and (5) treatment or measures taken by the claimant for relief of symptoms." Davis v. Astrue, 287 F.App'x 748, 760 (11th Cir. 2008) (unpublished) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vi)); see also 20 C.F.R. § 416.929(c)(3)(i)-(vi) (providing the same).

The ALJ found Claimant had medically determinable impairments that could reasonably be expected to produce the symptoms alleged; however, the ALJ further determined that "the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not entirely credible." Tr. at 16. Claimant argues the ALJ's credibility determination as to Ms. Carlton was flawed under the above-stated standard. Pl.'s Mem. at 11-12. The Commissioner does not argue the standard should not apply in a case such as this, in which Claimant's disability claim is based solely on mental impairments. See Memorandum in Support of the Commissioner's Decision (Doc. No. 19) ("Commissioner's Mem.") at 11-13. Assuming this standard does apply,[9] the issue is whether the ALJ explicitly articulated reasons for discrediting Ms. Carlton's testimony that are supported by substantial evidence.

The ALJ's reasons for discrediting Ms. Carlton's testimony and statements concerning the intensity, persistence, and limiting effects of Claimant's symptoms were articulated as follows:

> [T]he claimant plays football and his computer games, dresses himself independently, and met each of his developmental milestones appropriately. He also has several friends to play with. In addition, examining doctors reported that the claimant had no signs of a conduct disorder or attention deficit hyperactivity disorder during examinations. Dr. McLaughlin described the claimant as a well-behaved, polite child who exhibited good effort and concentration throughout testing. Dr. Kremper opined that this child was active during his examination, but did not appear to have excessive gross or fine motor activity. He had no significant difficulty sustaining attention throughout the interview. Both Dr[]s. McLaughlin and Kremper recommended mental health counseling. The records also reveal that the school placed the child in the emotionally handicapped classes for part of the day for special guidance in his weak subject areas. Had claimant been severely handicapped, he would

---

[9] The parties have not cited, and the undersigned has not found, any cases in which this standard has been applied when the only impairments alleged are mental impairments.

have been placed in special classes for the entire day.  In addition, records show that claimant has not been suspended from school for any reason[,] which would suggest that claimant has much better behavior than alleged.  It again should be emphasized that the that [sic] claimant's physicians found him a polite, well-behaved child who put forth good effort and concentration during all testing.

Accordingly, I find that the claimant's grandmother is only generally credible in her description of the claimant's functioning ability, especially when she is the sole caregiver for eight children.

Tr. at 19.  The ALJ was also "cognizant that the claimant has been transferred to the guardianship of his grandmother and was having difficulty adjusting from the only child in the home environment to one of eight children."  Tr. at 21.

Claimant contends some of the ALJ's reasons for discrediting Ms. Carlton's testimony were improper, inaccurate, and irrelevant.  See Pl.'s Mem. at 12.  Specifically, Claimant takes issue with the ALJ's suggestion that Claimant was having difficulty adjusting to living with his grandmother and the ALJ's observation that Ms. Carlton was the sole caregiver for eight children.  Id.  Claimant correctly states there is no evidence in the record that Claimant's problems were created or exacerbated by living with his grandmother.  Id.  Claimant also insists that Ms. Carlton's testimony is consistent with the school records and the records from the Peace River Center, and that her testimony is not inconsistent with the reports from Dr. McLaughlin and Dr. Kremper.  Id. at 13-14.

The import of the ALJ's statement regarding the number of children for whom Ms. Carlton was caring is not entirely clear.  While Claimant interprets the ALJ's statements to somehow disparage the care Ms. Carlton was providing for her grandchildren, it seems more likely the ALJ simply meant to convey that it would be difficult to make observations with the detail and specificity required for Ms. Carlton to formulate the opinions she

expressed at the hearing.  In other words, because Ms. Carlton's attention was divided among the children, there may have been possibility for confusion, as demonstrated by Ms Carlton's testimony that all of the children she was caring for were having difficulties similar to Claimant's.  Tr. at 307-08 .  Although it might arguably have been improper for the ALJ to refer to the number of children for whom Ms. Carlton was caring when discrediting her testimony, the ALJ articulated other reasons for believing Claimant's problems were not as severe as Ms. Carlton made them out to be, as discussed below.  Tr. at 19.

The ALJ explicitly articulated adequate reasons for finding Ms. Carlton's testimony was "only generally credible."  Tr. at 19-20.  The ALJ observed Claimant was able to play sports and video games.  Tr. at 19, 309-10.  The ALJ noted that Claimant met each of his developmental milestones.  Tr. at 19, 253.  In addition, the ALJ stated Claimant had several friends.  Tr. at 19,169.  The ALJ emphasized that  Ms. Carlton's testimony was inconsistent with the reports of the examining physicians, who described Claimant as well-behaved, polite, able to concentrate, and not hyperactive.  Tr. at 19, 168-74, 184-87.  Moreover, Ms. Carlton's testimony was inconsistent with the school's placement of Claimant in regular classes for most of the day; as the ALJ noted, one would expect Claimant to have been placed in special classes for the entire day rather than part of the day if his condition were truly disabling.  Tr. at 19, 151, 161, 282.  The undersigned finds the ALJ's explicitly articulated reasons for discrediting Ms. Carlton's testimony were adequate and supported by substantial evidence.

### B. The ALJ's Findings Regarding Claimant's Functional Limitations

Claimant asserts the ALJ's findings at the third step of the sequential evaluation process were not supported by substantial evidence. <u>See</u> Pl.'s Mem. at 14-17. At step three of the sequential evaluation process for children, the ALJ must determine whether a claimant's impairment or combination of impairments meets, medically equals, or functionally equals the listing of impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B. <u>See</u> 20 C.F.R. § 416.924(a); <u>see also</u> <u>Shinn ex rel. Shinn v. Comm'r of Soc. Sec.</u>, 391 F.3d 1276, 1278-79 (11th Cir. 2004). Claimant's theory is that his impairments functionally equal the listings. <u>See</u> Pl.'s Mem. at 14-17. To "functionally equal" the listings, a claimant's impairment must result in "marked" limitations in two domains of functioning or result in an "extreme" limitation in one domain of functioning. 20 C.F.R. § 416.926a(a). There are six domains of functioning: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for yourself; and health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

A "marked" limitation is more than moderate but less than extreme. 20 C.F.R. § 416.926a(e)(2). A claimant has a "marked" limitation when his or her impairment "interferes seriously with [his or her] ability to independently initiate, sustain, or complete activities." <u>Id.</u> Day-to-day functioning is seriously limited when the claimant's impairment limits only one activity or when the interactive and cumulative effects of the claimant's impairment limit several activities. <u>Id.</u> "It is the equivalent of functioning we would expect to find on standardized testing with scores that are at least two, but less than three

standard deviations below the mean." Id.  An "extreme" limitation "interferes very seriously" with a claimant's ability to independently initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(3).  It is the rating given to the most severe limitations.  See id.

Claimant contends there is not substantial evidence to support the ALJ's finding that Claimant did not have marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others.  Id. Claimant asserts "the ALJ ignored certain evidence, such as the GAF scores from Peace River and Nurse Davis'[s] assessment of [Claimant]'s functioning."   Pl.'s Mem. at 17.

### 1.  Acquiring and Using Information

The domain of acquiring and using information is used to consider how well a claimant acquires and learns information, as well as how well a claimant uses that information.  20 C.F.R. § 416.926a(g).  School-age children should be "able to learn to read, write, and do math, and discuss history and science"; they should be able "to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing . . . ideas, and by understanding and responding to the opinions of others."  20 C.F.R. § 416.926a(g)(2)(iv). The regulations provide examples of limited functioning in this domain that do not necessarily describe a marked or extreme limitation: lack of understanding words about space, size, or time; inability to rhyme words; difficulty recalling things learned in school yesterday; difficulty solving mathematics questions; and talking only in short, simple sentences with difficulty explaining meaning.  See 20 C.F.R. § 416.926a(g)(3).

The ALJ determined Claimant was having difficulties in school, but his limitations in acquiring and using information were less than "marked." Tr. at 22. The ALJ recognized that "[Claimant's] intellect has been shown to be in the borderline range," that Claimant repeated first grade and third grade, and that Claimant "has weaknesses in reading and writing skills." Id. However, the ALJ explained Claimant's school made accommodations by placing Claimant in special classes for part of the day. Id. The ALJ recognized that Dr. McLaughlin opined Claimant would benefit from a tutor. The ALJ also noted that Dr. McLaughlin and Dr. Kremper observed Claimant was able to concentrate on testing. Id. The ALJ implied that Claimant's emotional problems, an impediment to academic success, could be overcome. Id.

Claimant did have low scores on tests such as the Stanford Achievement Test, the Weschler Intelligence Scale for Children - Fourth Edition (WISC-IV), and the Woodcock Johnson Psychoeducational Battery - Third Edition. Tr. at 141-43, 171-73, 184. The regulations provide that test scores should be taken into account, but test scores are not conclusive. 20 C.F.R. § 416.926a(e)(4); 20 C.F.R. § 924a(a)(1)(ii) (stating the Social Security Administration "will not rely on test scores alone"). An ALJ should consider "test scores together with the other record evidence of a claimant's functioning, including reports of classroom performance and the observations of school personnel and others." 20 C.F.R. § 416.926a(e)(4)(ii). Here, the ALJ thoroughly discussed the findings of the doctors and other professionals who examined Claimant, specifically mentioning the tests administered by the School Psychologist, Ms. Beldin, and administered by the examining physicians, Dr. McLaughlin and Dr. Kremper. Tr. at 14, 17-18. The ALJ acknowledged

these test scores and Claimant's "borderline intellectual skills." Tr. at 18. However, the ALJ considered these test scores along with other evidence, pointing out that Claimant was in special classes only part of the day. Tr. at 19. The placement of Claimant in regular classes for eighty percent of the day, Tr. at 151, would suggest school personnel believed Claimant was capable of learning and that he did not have marked limitations in the domain acquiring and using information.

In addition, Rose I. Ogle, LCSW, a Clinician at the Peace River Center, observed that Claimant's orientation to time and people was appropriate for his age, and his level of insight and judgment skills "appeared to be fair." Tr. at 251; see also 20 C.F.R. § 416.926a(g)(3)(i) (stating that a lack of understanding of words about space, size, or time could be a sign of limited functioning). Dr. McLaughlin observed Claimant "expressed himself spontaneously throughout the evaluation and responded to questions relevantly and appropriately." Tr. at 170; see also 20 C.F.R. § 416.926a(g)(3)(v) (stating that talking only in short, simple sentences with difficulty explaining meaning could be a sign of limited functioning). Ms. Beldin did not state Claimant was totally unable to learn; rather, she stated Claimant would be expected to learn at a pace that is "slower than that of his peers." Tr. at 147; see also 20 C.F.R. § 416.926a(g)(2)(iv) (stating that a school-age "should able to learn" to read, write, and do math). Ms. Beldin suggested learning strategies, such as additional one-on-one instruction to help facilitate Claimant's academic progress, Tr. at 146, which evidences her belief Claimant was capable of learning. Furthermore, Dr. Carter and Dr. Martin reviewed Claimant's file, and they found that Claimant's limitations in the domain of acquiring and using information were less than marked. Tr. at 179, 190.

The undersigned has thoroughly reviewed the record. For the reasons stated above, substantial evidence supports the ALJ's determination that Claimant's limitations in the domain of acquiring and using information were less than marked.

### 2. Attending and Completing Tasks

The domain of attending and completing tasks is used to consider how well a claimant is able to focus and maintain attention, as well as how well the claimant begins, carries through, and finishes activities, including the pace at which those activities are performed. 20 C.F.R. § 416.926a(h). School-age children should be able to focus their attention in a variety of situations to follow directions, remember and organize school materials, and complete assignments. 20 C.F.R. § 416.926a(h)(2)(iv). They should be able to concentrate on details and not make careless mistakes (beyond what would be expected for a child of that age), change activities or routines without distracting themselves or others, stay on task and in place when appropriate, and sustain attention well enough to participate in group sports, read by themselves, and complete chores. Id. The regulations provide examples of limited functioning in this domain that do not necessarily describe a marked or extreme limitation: the claimant is easily startled, distracted, or overreactive to sounds, sights, movements, or touch; the claimant is slow to focus on or fails to complete activities of interest, like games or art projects; the claimant repeatedly becomes sidetracked or frequently interrupts others; the claimant is easily frustrated and gives up on tasks; the claimant requires extra supervision. 20 C.F.R. § 416.926a(h)(3).

The ALJ found Claimant's limitations in the domain of attending and completing tasks to be less than marked.  Tr. at 23.  The ALJ observed that the opinions of the examining physicians were inconsistent with the allegations that Claimant could not pay attention, could not sit still, and cried when frustrated.  Id.  The ALJ pointed out that Dr. Kremper described Claimant as active, not hyperactive, and Dr. McLaughlin stated Claimant had good concentration and was extremely well behaved.  Id.  The ALJ also noted that Claimant's grandmother stated he could complete tasks if offered a reward.  Id.

The ALJ articulated adequate reasons for finding Claimant's limitations in the domain of  attending and completing tasks were less than marked, and his reasons are supported by substantial evidence.   Although Nurse Davis opined Claimant's concentration, persistence, and pace were markedly limited, Tr. at 200, the ALJ accepted the diagnoses of the examining physicians, who did not diagnose Claimant with ADHD. Tr. at 19.   Dr. McLaughlin saw "no evidence of attentional problems" during the examination, Tr. at 174, and Dr. Kemper stated Claimant did not seem hyperactive, was able to remain seated during the examination, and did not appear to be particularly distractable.  Tr. at 185.  The ALJ also noted Claimant was able to play sports and video games.  Tr. at 19, 309-10.

Contrary to Claimant's assertions, the ALJ did not "ignore" Nurse Davis's assessment.  See  Pl.'s Mem. at 17.  In fact, the ALJ thoroughly discussed the Medical Questionnaire completed by Nurse Davis.  Tr. at 16-17.  The detail with which the ALJ discussed Nurse Davis's assessment makes clear that the ALJ reviewed her opinion, including her statement that Dr. King had initially evaluated and treated Claimant.  Id.; Tr.

at 201.[10]  The ALJ observed that Nurse Davis stated Claimant's symptoms were stabilized with Adderall.  Tr. at 17, 201; cf. Gibbs v. Barnhart, 130 F. App'x 426, 431 (11th Cir. 2005) (unpublished) (explaining that the claimant's ADHD was controlled with medication).  The ALJ also recognized Nurse Davis reported Claimant was still struggling academically, which she attributed to a learning disorder that co-occurred with his ADHD/ODD.  Tr. at 17, 201.  Thus, it is clear the ALJ considered Nurse Davis's opinion, but the ALJ was persuaded by the opinions of Dr. McLaughlin and Dr. King.

The ALJ's determination that Claimant did not have marked limitations in the domain of attending and completing tasks is further bolstered by the opinions of Dr. Carter and Dr. Martin.  Dr. Carter and Dr. Martin both reviewed Claimant's file, and they found Claimant's limitations in this domain were less than marked.  Tr. at 179, 190.

The undersigned has thoroughly reviewed the record and recognizes there is some evidence Claimant had marked limitations in the domain of attending and completing tasks, as discussed above.  Nonetheless, the undersigned is convinced the ALJ's determination that Claimant had less than marked limitations in the domain of attending and completing tasks is supported by substantial evidence.  Cf. Henry v. Barnhart, No. 05-13848, 156 F. App'x 171, 173, 175 (11th Cir. 2005) (unpublished) (affirming the Commissioner's denial of benefits to a child who claimed disability based on mental retardation when the child's IQ was in the "borderline" range of sixty through seventy, and the child suffered from ADHD).

----

[10] Dr. King did not submit a medical questionnaire or other report, and her treatment notes shed little light on the details and severity of claimant's condition.  Furthermore, it appears the care given at the Peace River Center was provided predominantly by Nurse Davis.

### 3. Interacting and Relating with Others

The domain of interacting and relating with others is used to consider how well a claimant initiates and sustains emotional connections with others, develops and uses the language of the community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). School-age children should be able to develop lasting friendships with other children the same age, begin to understand how to work in groups to create projects and solve problems, speak in a manner that both familiar and unfamiliar listeners can readily understand, have an increasing ability to tolerate differences and understand others' points of view, and be able to talk to people of all ages to share ideas, tell stories, and speak in a manner that both familiar and unfamiliar listeners can readily understand. 20 C.F.R. § 416.926a(i)(2)(iv). The regulations provide examples of limited functioning in this domain that do not necessarily describe a marked or extreme limitation: the claimant does not reach out to be picked up and held by the caregiver; the claimant has no close friends, or the friends are all older or younger; the claimant avoids or withdraws from people who are known, or is overly anxious or fearful of meeting new people or trying new experiences; the claimant has difficulty playing games or sports with rules; the claimant has difficulty communicating with others; and the claimant has difficulty speaking intelligibly or with adequate fluency. 20 C.F.R. § 416.926a(i)(3).

The ALJ found Claimant had less than marked limitations in the domain of interacting and relating with others. Tr. at 24. The ALJ explained that, although Nurse Davis indicated Claimant's social development was markedly limited, Claimant was able

to get along with peers and adults most of the time, and he was without significant behavioral problems. Tr. at 17, 24. The ALJ observed Claimant had never been suspended from school. Tr. at 24. The ALJ pointed out Claimant interacted well with the examining physicians. Id. Dr. Kremper described Claimant as "an alert, smiling lad with whom rapport was easily established." Tr. at 185. Dr. McLaughlin described Claimant as "alert and cooperative." Tr. at 170. Dr. McLaughlin also noted Claimant had several age-appropriate friends. Tr. at 169.

Claimant also argues the ALJ's decision is unsupported by substantial evidence because the ALJ ignored Claimant's GAF scores. Pl.'s Mem. at 14, 17. "The [GAF] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations." Mathis v. Astrue, No. 3:06-cv-816-J-MCR, 2008 WL 876955, at *7, n. 4 (M.D. Fla. Mar. 27, 2008) (unpublished) (citing Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") (4th ed. 1994) at 32). While GAF scores have been frequently used in Social Security disability benefits determinations, courts have often given them limited weight. "Reliance upon a GAF score is of questionable value in determining an individual's mental functional capacity." Gasaway v. Astrue, No. 8:06-cv-1869-T-TGW, 2008 WL 585113, at *4 (M.D. Fla. Mar. 3, 2008) (unpublished) (citing Deboard v. Comm'r of Soc. Sec., No. 05-6854, 211 F. App'x 411, 415-416 (6th Cir. 2006) (unpublished)); see also Wind v. Barnhart, No. 04-16371, 133 F. App'x 684, 692 n. 5 (11th Cir. 2005) (unpublished) (noting that the Commissioner of Social Security has indicated that GAF scores have no direct correlation to the severity of a mental impairment); Parsons

v. Astrue, No. 5:06cv217/RS-EMT, 2008 WL 539060, at *7 (N.D. Fla. Feb. 22, 2008) (same).

Even if Claimant's GAF scores were relied upon, they would not necessarily lead to a finding of disability. Most recently, on April 27, 2006, Claimant's GAF score was fifty-two, and his highest GAF score in the previous year had been sixty, Tr. at 222. A GAF score in the range of fifty-one to sixty indicates only "moderate" symptoms or difficulties. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") (4th ed. 1994) at 34. Although Claimant was apparently given a GAF score of forty-five on December 4, 2003, Tr. at 247, a GAF score of thirty-five to forty on April 7, 2005, Tr. at 242, and a GAF score of forty-eight on December 29, 2005, "courts generally find that a GAF score of 50 or below is not in and of itself determinative of disability." Jones v. Astrue, 494 F.Supp.2d 1284, 1288 (N.D. Ala. 2007) (citing, among others, Hillman v. Barnhart, 48 F.App'x 26, 30 n.1 (3d Cir. 2002) (unpublished) (noting a GAF score of fifty indicates a claimant is capable of performing some substantial gainful activity); Seymore v. Apfel, 131 F.3d 152, 1997 WL 755386 at *2 (10th Cir. 1997) (unpublished) (explaining that a GAF score of forty-five does not necessarily prove a claimant is unable to hold a job); but see Lloyd v. Barnhart, 47 F.App'x 135, 135 n.2 (3d Cir. 2002) (noting that a vocational expert opined that a GAF score below fifty indicates an inability to keep a job)).

Furthermore, after reviewing Claimant's file, Dr. Carter found Claimant had no limitations in the domain of interacting and relating with others, Tr. at 179, and Dr. Martin found Claimant had less than marked limitations in the domain of interacting and relating with others. Tr. at 190.

The undersigned has thoroughly reviewed the record. The ALJ's determination with respect to the domain of interacting and relating with others is supported by substantial evidence.

### C. New Evidence

Claimant asserts the Appeals Council "erred in not considering" new and material evidence. Pl.'s Mem. at 19. "The Appeals Council must consider new, material, and chronologically relevant evidence and must review the case if the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." Ingram v. Comm'r Soc. Sec. Admin., 496 F.3d 1253, 1261 (11th Cir. 2007) (quotation and citations omitted). Here, the Notice of Appeals Council Action stated, "In looking at your case, we considered the reasons you disagree with the decision, as set forth in the brief from your representative dated November 5, 2007 and the additional evidence also listed on the enclosed Order of Appeals Council. We found that this information does not provide a basis for changing the Administrative Law Judge's decision." Tr. at 4-5 (emphasis added). The Order of Appeals Council stated, "The Appeals Council has received additional evidence which it is making part of the record," and the exhibits Claimant submitted after the ALJ 's decision are listed. Tr. at 7. Thus, it appears the Appeals Council did in fact consider the additional evidence submitted by Claimant.

"[A] federal district court must consider evidence not submitted to the administrative law judge but considered by the Appeals Council when that court reviews the Commissioner's final decision denying Social Security benefits." Ingram, 496 F.3d at 1258.

"[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." See id. at 1262.

The new evidence that was submitted to the Appeals Council consisted of the previously-described Vanderbilt ADHD Diagnostic Teacher Rating Scale, Tr. at 271-72, and the September, 2007 IEP, Tr. at 279-95. See supra at 8-9. The Vanderbilt ADHD Diagnostic Teacher Rating Scale reflected the opinion of Ms. Bass, Claimant's third grade teacher. Tr. at 271-72. Ms. Bass's opinion was inconsistent with the findings of the examining physicians, whose opinions support the ALJ's conclusion that Claimant did not have marked limitations in the domains of attending and completing tasks, acquiring and using information, and interacting and relating with others. Tr. at 174, 185, 187. In addition, Ms. Bass's opinion was merely cumulative of other evidence in the record. For example, the opinions and observations expressed in the Teacher Questionnaire completed by Patty Jo Schrader, Claimant's first grade teacher, Tr. at 106-13, are highly similar to those in the Vanderbilt ADHD Diagnostic Teacher Rating Scale completed by Ms. Bass. Although Ms. Bass's opinion arguably tended to support finding a marked limitation in the domain of attending and completing tasks, Ms. Schrader had previously reported Claimant exhibited such behaviors. Corroboration of these behaviors does not change the fact that the examining physicians found Claimant had less than marked limitations in the relevant domains, and that the school's placement of Claimant in regular classes was inconsistent with disability.

Neither can it be said that the IEP from September of 2007 renders the Commissioner's final decision erroneous. Although the IEP indicated Claimant's previous IEP goals had not been met, Tr. at 282, other aspects of it support the ALJ's findings. For example, the IEP stated, "[Claimant] can sound out simple words and can read some basic sight words." Tr. at 282; see also 20 C.F.R. § 416.926a(g)(2)(iv) (stating that a school-age child "should able to learn" to read, write, and do math). It also noted Claimant responded well to individualized instruction, Tr. at 284, suggesting Claimant would be able to improve his reading and writing skills with additional one-on-one instruction. Further, Claimant "was able to retell stories in an age appropriate manner and demonstrate comprehension of directions adequately." Tr. at 282. The IEP did not state Claimant is totally unable to complete assignments. Id. Rather, it stated Claimant "is slow to complete assignments." Id. The statement that "[Claimant] needs to improve his basic spelling and writing skills in order to complete writing assignments and pass standardized tests," id., suggests that such improvement is possible.

The undersigned has considered the evidence submitted after the ALJ rendered his decision. Neither the IEP from September of 2007 nor the Vanderbilt ADHD Diagnostic Teacher Rating Scale renders the Commissioner's final decision erroneous.

## V. Conclusion

After a thorough review of the record, the undersigned is convinced the ALJ properly discounted the testimony of Claimant's grandmother, and that the ALJ's decision is supported by substantial evidence. In addition, the new evidence submitted to the Appeals Council does not render the ALJ's decision erroneous. Accordingly, it is

**ORDERED:**

1.      The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) as incorporated by § 1383(c)(3) **AFFIRMING** the Commissioner's final decision.

2.      The Clerk of Court is directed to close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 31st day of March, 2009.

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

Copies to:
Counsel of Record